```
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2
                        CASE NO. 21-MJ-06599-AOV
 3
     UNITED STATES OF AMERICA,
 4                                      Fort Lauderdale, Florida
                 Plaintiff(s),
 5                                      November 8, 2021

 6           vs.

 7   WALDER ST. LOUIS,

 8               Defendant(s).      Pages 1 - 41
     ------------------------------------------------------------
 9                         DETENTION HEARING
             TRANSCRIBED FROM DIGITAL AUDIO RECORDING
10            BEFORE THE HONORABLE LURANA S. SNOW
                 UNITED STATES MAGISTRATE JUDGE
11
     APPEARANCES:
12
     FOR THE PLAINTIFF(S):  CATHERINE KOONTZ, ESQ.
13                          UNITED STATES ATTORNEY'S OFFICE
                            500 East Broward Boulevard
14                          Fort Lauderdale, FL 33394
                            954-660-5940
15                          catherine.koontz@usdoj.gov

16

17   FOR THE DEFENDANT(S):  TIMOTHY DAY, ESQ.
                            FEDERAL DEFENDER'S OFFICE
18                          1 E Broward Boulevard
                            Fort Lauderdale, FL 33301
19                          954-356-7436
                            timothy_day@fd.org
20

21   TRANSCRIBED BY:        Joanne Mancari, RPR, CRR, CSR
                            Court Reporter
22                          jemancari@gmail.com

23

24

25
```

1    Thereupon,

2    the following proceedings were held via Zoom videoconference:

3              THE DEPUTY CLERK:  United States District Court for

4    the Southern District of Florida is now in session.  Honorable

5    Lurana Snow, United States magistrate judge, presiding.

6              All parties are advised that all forms of equipment or

7    means of photographing, audio or video recording, broadcasting

8    or televising, email or texting or any form of communication

9    between witnesses or parties are prohibited while the court is

10   in session or in recess in accordance with local Rule 77.1.

11             Calling case 21-6599, USA v. Walder St. Louis.

12             Please state your appearances.

13             MS. KOONTZ:  Good morning, your Honor.  Catherine

14   Koontz on behalf of the United States.

15             MR. DAY:  Good morning, your Honor.  Tim Day, from the

16   federal Defender's Office, on behalf of Walder St. Louis.

17             THE COURT:  All right.  Mr. St. Louis, we are

18   proceeding by videoconference because the pandemic is still

19   going on.

20             Are you willing to go forward by videoconference?

21             THE DEFENDANT:  Yes, I am.  Yes, I am.

22             THE COURT:  As to all people on the calendar today,

23   the government is reminded that pursuant to the amended Rule 5,

24   all Brady and Giglio material must be turned over, and failure

25   to do that could result in sanctions, including contempt of

1   court.

2          Ms. Koontz, you may proceed by proffer.  I see you

3   have an FBI agent available for cross.

4          MS. KOONTZ:  That's correct, your Honor.  Thank you.

5          Your Honor, I'm proceeding today both on the danger to

6   community prong and the risk of flight prong.  There is a

7   presumption in favor of detention, and that is pursuant to 18

8   U.S.C. 3142(f)(1)(E), because it involves a crime that is a

9   possession or use of a firearm or destructive device.

10          Your Honor, this defendant is charged by complaint for

11   conspiracy to violate the Export Control Reform Act.  He is

12   complained for smuggling and conspiracy to violate the Export

13   Control Reform Act.

14          A violation of the Export Control Reform Act carries a

15   max penalty of 20 years' imprisonment, a violation of the

16   smuggling charge carries a max penalty of ten years, and for

17   conspiracy to violate the Export Control Reform Act, that's a

18   max penalty of five years.

19          Again, your Honor, I do have special agent with the

20   FBI Joseph Kenny available for cross-examination.

21          The background, starting with the background on the

22   400 Mawozo and Haitian kidnappings.

23          400 Mawozo is a Haitian gang and criminal organization

24   that operated in the area to the east of Port-au-Prince, Haiti.

25          On or about October 16, 2021, at approximately 1 p.m.

Eastern Standard Time, 16 United States citizens were kidnapped near Port-au-Prince, Haiti, including five children, one as young as eight months old. The victims were part of a missionary organization that had been taking a bus to visit a local orphanage. While returning therefrom, the kidnappers forced at gunpoint the group's bus driver to stop and took control of the bus and its occupants.

On or about October 16, 2021, a representative of the missionary organization received a phone call from an individual claiming to be the leader of the kidnappers. The individual stated that he had the victims and was holding them for ransom of $1 million each. The individual told the representative that he would be in touch regarding next steps.

On or about October the 18th of 2021, Haitian social media began to share reporting that a specific gang, known locally as the 400 Mawozo, had taken credit for the kidnapping and was making publicly known the ransom demand.

On or about October 22, 2021, the Facebook video post showed Individual 2 at a local funeral for a killed gang member stating that he intended to kill the Americans if he did not receive his money.

As of this date the hostage takers have had several ransom calls with a representative of the missionary organization. The hostage takers have not released any of the victims.

```
 1            Coconspirator 1 is a Haitian national and a member of
 2    the 400 Mawozo.  Coconspirator 1 is incarcerated, but still
 3    serves as a leader of the organization in Haiti and directs
 4    operations from prison using an unmonitored cellular phone.
 5            Individual 2 is a Haitian national and a member of 400
 6    Mawozo.  Individual 2 serves as a leader of the organization in
 7    Haiti.  Individual 2 has appeared on videos posted on social
 8    media, stated his name, and declared himself as the leader of
 9    the 400 Mawozo.
10            THE COURT:  We are hearing the interpreter's
11    translation.
12            MR. DAY:  Actually, your Honor, I think that is Andrè.
13            THE COURT:  Oh.
14            THE INTERPRETER:  Your Honor, it is not the
15    interpreter.
16            THE COURT:  OK.  Sorry.
17            Andrè, we are hearing you.
18            All right.  Ms. Koontz, go ahead.  I'm sorry.
19            Andrè, you are coming through.  You need to turn off
20    your own mic.
21            A VOICE:  Sorry.
22            MS. KOONTZ:  On or about October 18, 2021, Haitian
23    social media began to share a recording that a specific gang,
24    known locally as 400 Mawozo, had taken credit for the
25    kidnapping and was making publicly known the ransom demand.
```

1        On or about October 22, 2021, the Facebook video post

2   showed Individual 2 at a local funeral for gang members stating

3   that he intended to kill the Americans if he did not receive

4   his money.

5        As of this date, the hostage takers have had several

6   calls with a representative of the missionary organization.

7   The hostage takers have not released any of the victims.

8        Coconspirator 1 is a Haitian national and a member of

9   400 Mawozo.  Coconspirator 1 is incarcerated, but still serves

10  as a leader of the organization in Haiti and directs operations

11  from prison using an unmonitored cellular phone.

12       Individual 2 is a Haitian national and a member of 400

13  Mawozo.  Individual 2 serves as a leader of the organization in

14  Haiti.  Individual 2 has appeared on videos posted on social

15  media, stated his name, and declared himself as the leader of

16  400 Mawozo, including videos posted on social media sites

17  YouTube and Facebook.  And on October 22, 2021, Individual 2

18  has given video recorded statements to the Haitian press in

19  which he claims to be the leader of 400 Mawozo, including in

20  videos posted by press organizations on or about April 13, 2020

21  and September 6, 2021.

22       Tunis is a U.S. citizen, born in Haiti, who resides in

23  Florida and is a member of 400 Mawozo.

24       As described further herein, Tunis and her

25  coconspirators obtained weapons and ammunition in the United

1  States and sent the same to 400 Mawozo members in Haiti.  In

2  order to achieve the scheme, among other things, Tunis used

3  straw purchasers and falsified ATF paperwork and smuggled and

4  concealed the weapons and ammunition in shipping containers.

5  Tunis has pledged her allegiance to 400 Mawozo on prior

6  occasions, including as follows:

7       On or about October 19, 2021, Tunis texted

8  Coconspirator 1 on What's App, in Creole, "Don't worry about

9  it, stay calm.  You know we are 400 Mawozo and we are strong.

10 Keep a cool head."

11      Also, on October the 19th, 2021, Tunis sent an audio

12 file to Coconspirator 1 on What's App, in Creole.  "We are

13 snakes.  We slither to get where we are going.  They would be

14 shocked to see Mawozo invade Miami."

15      These conversations demonstrate Tunis' leadership in

16 the gang because she directly communicates with its leader,

17 Coconspirator 1.  Additionally, Tunis' statement that they

18 would be shocked to see Mawozo invade Miami confirmed Tunis'

19 covert affiliation with the gang in South Florida.

20      Dor is a Haitian citizen who resides in Florida.  Dor

21 holds a Florida concealed carry permit, weapons permit, and the

22 five-day waiting period to possess a firearm is inapplicable to

23 Dor.

24      St. Louis is a Haitian citizen who resides in Florida.

25 St. Louis holds a Florida concealed weapons permit as well, and

```
 1   the five-day waiting period to possess a firearm is

 2   inapplicable to St. Louis.

 3           The conspiracy.

 4           Beginning at least on or about September 24, 2021, and

 5   continuing until the present, Tunis, Coconspirator 1, Dor, St.

 6   Louis, and others known and unknown, in an offense that began

 7   and committed in Haiti, and continued within the District of

 8   Columbia and elsewhere, knowingly combined, conspired,

 9   confederated, and agreed together and with each other to commit

10   a crime against the United States and its agency, the

11   Department of Commerce, to wit, to export and cause the

12   exportation of goods from the United States to Haiti without

13   first obtaining the required licenses from the Bureau of

14   Industry and Security, located in the District of Columbia, in

15   violation of 18 U.S.C. 4819, also known as ECRA.

16           It was part and a goal of the conspiracy --

17           MR. DAY:  Your Honor, could I interrupt for a minute?

18           THE COURT:  Sure.

19           MR. DAY:  It appears that Ms. Koontz is reading from

20   the complaint.  I mean, the complaint is a part of the file.  I

21   have no objection to the court relying on the complaint.

22           THE COURT:  Yes.  I just noticed that myself, that she

23   was reading the complaint.  Sometimes when someone else signs

24   the complaint, I need that information.  I have actually read

25   this complaint.
```

```
1            MS. KOONTZ:  OK.

2            THE COURT:  So if you want to stand on it, you can,

3    and then present any further information that you wish to

4    present.

5            MS. KOONTZ:  OK.  Very good.  Then I will stand on the

6    complaint, but I do have some additional information --

7            THE COURT:  OK.

8            MS. KOONTZ:  -- I want to present.

9            What I want to say that was not part of the complaint

10   is that a federal search warrant was executed on the cell phone

11   belonging to Tunis.  On that cellular phone they conducted a

12   federal search warrant and they found not only the messages

13   that were contained in the complaint and the tracking

14   information as well that is in the complaint, but there were

15   also images of both Tunis, St. Louis and Dor in various stores

16   purchasing firearms.

17           Of particular interest, there was a photo of St. Louis

18   on October the 6th, 2021 in a firearms store purchasing

19   firearms, which he later admitted via text messages were

20   shipped to Haiti.

21           Your Honor, the agent, agent Kenny, and I don't know

22   how you want to do this, if you want me to do this after

23   cross-examination, but I would like to admit those photos.  I

24   think I have previously sent them to the court, to defense, and

25   agent Kenny also has a copy.  I would like to ask him some
```

Kenny - Direct

1   questions going through those photos, but I don't know if you

2   want to do that after cross-examination or if you want me to do

3   that now.

4           THE COURT:  No, it's part of direct.

5           Mr. Day, do you have any objections to the

6   photographs, which I guess it is composite 1?

7           MR. DAY:  Your Honor, I have reviewed them and I don't

8   anticipate an objection.  Of course, I don't know anything

9   about them.  I don't know what they relate to, their

10  authenticity.  I would assume that the government will be able

11  to demonstrate that they are a part of this case.

12          THE COURT:  All right.  So Exhibit 1 will be

13  conditionally admitted subject to a motion to strike if those

14  things aren't accomplished.

15          So go ahead, Ms. Koontz.

16  DIRECT EXAMINATION

17  BY MS. KOONTZ:

18  Q   Hi, agent Kenny.

19  A   Good morning, ma'am.  How are you?

20  Q   Good.  How are you?

21          THE COURT:  If you are going to ask him questions, we

22  need to swear him in.

23          THE DEPUTY CLERK:  Please raise your right hand.

24          Do you swear to tell the truth, the whole truth, and

25  nothing but the truth so help you God?

Kenny – Direct

1   THE WITNESS:  Yes, ma'am, I do.

2   THE DEPUTY CLERK:  If you would please state your name

3   and spell your last name for the record.

4   THE WITNESS:  Joseph Kenny, K-E-N-N-Y.

5   BY MS. KOONTZ:

6   Q    Good morning.

7   A    Good morning.

8   Q    Did you receive a copy of Government's Exhibit No. 1?

9   A    Yes, ma'am, I did.

10  Q    OK.  Can you please tell me what Government's Exhibit No. 1

11  is.

12  A    Sure.  The FBI conducted a federal search warrant on

13  Eliande Tunis' cell phone.  Upon a dump of the phone, these

14  were some of the photos that were taken off of it that

15  basically coincide with what the complaint states.

16  I can go through each photo.  I don't know how you

17  want to do it this morning.

18  Q    OK.  So these photos --

19  A    (Inaudible).

20  Q    So you know these pictures came from her cellular phone

21  that was obtained via federal search warrant.

22  Do you know at what point her cellular phone was

23  seized?

24  A    I have a hard time remembering.  I have limited knowledge

25  on the case.  However, she was interviewed whenever she flew

Kenny – Direct

1  into Fort Lauderdale airport.  Agents made contact with her

2  there, where she had two cell phones.  One she said was a

3  Haitian cell phone and the other one was one she used in the

4  United States.

5       She provided consent for the one she uses in Haiti,

6  however, the United States phone was not consent given, which

7  is why a federal search warrant was obtained on it.  I believe

8  it was seized there at the airport, but I do not recall.

9  Q   OK.  Do you know if these photos came from her cellular

10 phone?

11 A   They did come from her cell phone, yes, ma'am.

12 Q   And how do you know that?

13 A   I know that from speaking with the agents as well as

14 working with the Intel analyst here to go through that phone

15 data dump as well as references made in the complaint to these

16 photos.

17 Q   OK.  Thank you.

18      MS. KOONTZ:  Your Honor, at this point we would move

19 Government Exhibit No. 1 into evidence.

20      THE COURT:  OK.  Any objection to the authenticity?

21      MR. DAY:  Your Honor, I'll defer to the court with

22 regard to the authenticity.

23      THE COURT:  Well, I will admit them since hearsay is

24 admissible at this stage of the proceedings.  If there are any

25 objections as to relevance, you can make that at the end.

Kenny – Direct

1          So these are all received.

2          (Government's Exhibit 1 received in evidence)

3     BY MS. KOONTZ:

4     Q   Agent Kenny, if we would start, please, on page 1 of

5     Government Exhibit 1.  If you could go through those

6     photographs and tell us what we're seeing, starting with the

7     top photograph?

8     A   Yes, ma'am.  That photograph has a time stamp of October 9,

9     2021, at 3:09 p.m.  This is a photo of the inside of a blue

10    barrel.  You see a hand pulling back some of the clothing and

11    article items that are in that barrel to indicate where there

12    is a weapon near the blue and pink backpack.

13    Q   OK.  The second photo or the middle photo of that page.

14    A   This is also another blue barrel with firearms inside that

15    are wrapped in garbage bags.  This is October 9, 2021, at 4:14

16    p.m.

17    Q   And the last photo on that page.

18    A   The last photo is October 20, 2021.  This is a picture of

19    multiple blue barrels covered in packing wrap, also indicated

20    in the complaint.

21    Q   And, again, these are wrapped consistent with what appeared

22    in the text messages in the complaint, is that correct?

23    A   That is correct.

24    Q   OK.  Turning to page 2.  If you could describe what we're

25    seeing there, please.

Kenny – Direct

1    A    Sure.  This has a time stamp of October 19, 2021 at 11:07

2    a.m.  This is another blue barrel with firearms wrapped in

3    garbage bags inside.

4    Q    And the second photo?

5    A    October 9, 2021, 3:20 p.m.  This is another blue barrel and

6    it has a sheet covering the contents of what's inside.

7    Q    OK.  And the third page, please.

8    A    October 9, 2021, 12:41 p.m.  This is a photo of multiple

9    cases of ammunition.

10   Q    OK.  And the last photo.

11   A    October 9, 2021, 3:12 p.m.  This is another photo of one of

12   the blue barrels showing contents inside covering, you see red

13   Gatorade, shoes, clothing.

14   Q    And once again, consistent with the packing that was

15   described in the text messages found on the phone as well?

16   A    Yes, ma'am.

17   Q    OK.  And the fourth page, please.

18   A    October 11, 2021, 7:26 p.m.  This is a photo of ammunition,

19   5.7X28 millimeter, which is consistent in the complaint as to

20   the type of ammunition that was being requested, also known as

21   the pointy bullet.

22   Q    OK.  This, I believe, was requested by Coconspirator 1, is

23   that correct?

24   A    Yes, ma'am.

25   Q    And in the second page on that photo, is that just another

Kenny - Direct

1   photo of that ammunition?

2   A   Yes, ma'am.

3   Q   OK.  The fifth page.

4   A   The fifth page on the top left, 9/14/2021.  It appears to

5   be a screenshot of an auto sear kit to make a firearm, give it

6   the ability to go into a full auto instead of semiautomatic.

7   Q   OK.  The photo to the right of that.

8   A   The top right is 9/27/2021, 9:14 p.m.  That is going to be

9   a selfie of Eliande Tunis.

10  Q   And the photo on the left bottom.

11  A   That is going to be 10/6/2021, 7:42 p.m.  It is going to

12  be, appears to be a photo of a firearm.

13  Q   Now, is that consistent in the text messages that are in

14  the complaint when Mr. St. Louis is actually at a store?

15  A   Yes, ma'am.

16  Q   OK.  Then the photo to the right.

17  A   9/26/2021, 2:55 p.m.  It appears an unknown subject holding

18  a firearm.

19  Q   I'm moving on to the sixth page.

20  A   9/29/2021 at 6:07 p.m.  That appears to be a magazine for a

21  firearm.

22  Q   And to the right of that.

23  A   9/27/2021, at 6:45 p.m.  This is a screenshot of

24  Sportsman's Warehouse website.  On the left there appears to be

25  a magazine for a firearm, and then the firearm on the right.

Kenny - Direct

1    Q    And the middle left, please.

2    A    9/21/2021, 9:47 p.m.  It appears to be a photo taken inside

3    a pawn shop or a gun shop with one of the sales clerk's pulling

4    something up on the internet of a firearm.

5    Q    And to the right of that, please.

6    A    10/1/2021, at 5:21 p.m.  It is a photo of a magazine inside

7    of a plastic bag.

8    Q    OK.  Tell us about that bottom photo, please.

9    A    So it's dated 9/21, at 9:36 p.m.  That would be a photo of

10   a male inside of a gun store, pawn shop holding a firearm, and

11   it's consistent with St. Louis.

12   Q    Consistent with St. Louis.  How do we know that is St.

13   Louis?

14   A    This is also a live photo that was taken.  So during the

15   live photo you can see Mr. St. Louis moving around, as well as

16   it's consistent with text messages being sent between him and

17   Tunis.

18   Q    And also 9/21/21 in the complaint, it is also a time when

19   Mr. St. Louis filled out the false ATF form, is that correct?

20   A    Yes, ma'am, it is.

21   Q    Turning to page 7, top photo there.

22   A    October 14, 2021, at 3:27 p.m.  It is a photo of two

23   firearms, a revolver on the left and a pistol on the right.

24   Q    OK.  And that bottom photo, what is that?

25   A    These two photos are on 10/10/2021, 6:22.  It is a photo of

Kenny - Direct

1    a pawn shop receipt at Lucky Pawn.  It shows it has three items

2    on there and a background check for Walder St. Louis, and the

3    invoice date there is 10/6 of 2021.

4           The numbers are hard to make out at the bottom.  It

5    shows that the bill is $2,855, total paid, and 10 cents, with

6    an amount due $2,854.90.

7    Q   OK.  And is this also -- I'm sorry.  Go ahead.

8    A   This is consistent with the ATF forms that would be filled

9    out, as well as the prices and amounts stated in the complaint,

10   as well as the receipt sent to Tunis.

11   Q   Right.  In the complaint a receipt was sent from Tunis to

12   St. Louis for the purchase of these firearms, correct?

13   A   St. Louis had sent these to Tunis documenting the purchase

14   of these items.

15   Q   OK.  In the complaint it also talks about St. Louis

16   confirming that he had sent two barrels, and "I have other

17   firearms inside of it.  They sent two barrels for $400.  The

18   barrels were sent to Laboule 16."

19   A   Correct.

20   Q   All right.  Page 8, please.

21   A   10/15/2021, at 7:28 p.m.  It is another picture of a black

22   firearm.  It appears to be on a counter.

23   Q   And the middle photo?

24   A   October 7, 2021, at 3:22 p.m., and another photo of a

25   firearm inside of a box.

Kenny - Direct

1    Q    And the last photo of that page.

2    A    September 21, 2021, at 9:36 p.m.  That is a photo

3    consistent with St. Louis standing inside of a pawn shop with a

4    firearm blocking his face.

5    Q    Page 9, please.  If you can describe these photos.

6    A    October 9, 2021, 3:14 p.m.  The top photo is a blue barrel

7    with what appears to be a blanket or clothing on top of the

8    contents.

9    Q    A little further, please.

10   A    October 9, 2021, 2:15 p.m.  It is a photo of a firearm

11   wrapped in a garbage bag on top of a rifle case.

12   Q    And that last photo.

13   A    October 10, 2021, at 5:49 p.m.  This is a screenshot of

14   text messages indicating of 5X7X28 Ruger Prescott and then a

15   screenshot of the firearm.

16   Q    And again, all that relates back to the complaint?

17   A    Yes, ma'am, it does.

18   Q    OK.  Page 10, please.

19   A    October 9, 2021.  That is a photo of a firearm --

20   ammunition -- I'm sorry -- for a 308, I would imagine.

21   Q    And that bottom photo, please.

22   A    October 11, 2021, at 8:36 p.m.  That is the photo of the

23   back of a bullet for the -- I'm having a hard time making that

24   out.  That's the back of a casing.

25   Q    And that would be the marking of the caliber of that

Kenny – Direct

1   bullet, correct?

2   A    Correct.

3   Q    All right.  Page 11.

4   A    October 11, 2021.  That appears to be a photo of a firearm

5   case in the back, as well as laser ammunition in the front.

6   Q    Middle photo, please.

7   A    September 21, 2021, at 10:12 p.m.  That's a photo of

8   another firearm held by a darker-skinned individual with long

9   nails.

10   Q    The bottom photo, please.

11   A    October 1, 2021, at 6:30 p.m.  It's a photo of a firearm,

12   rifle.

13   Q    And page 12, please.

14   A    October 6, 2021, 7:42 p.m.  It's another photo of a firearm

15   inside of what appears to be a gun shop.

16   Q    And, again, that October 6 date relates back to St. Louis?

17   A    Yes, ma'am, it does.

18   Q    OK.  The bottom photo.

19   A    October 10, 2021.  It is another picture of an invoice and

20   it appears the invoice for $80 with the ammunition there in the

21   top, consistent with what was requested by Coconspirator 1.

22   Q    Page 13, please.

23   A    October 6, 2021, at 7:42 p.m.  Another firearm, picture of

24   a firearm, which appears to be inside of a gun store,

25   consistent with the complaint and the ATF forms.

Kenny - Direct

1   Q   And the bottom page, please.  Bottom photo, I mean.

2   A   October 6, 2021, at 7:42 p.m.  It's another photo of a

3   firearm inside of what appears to be the same gun store.

4   Q   OK.  Page 14, please.

5   A   September 30, 2021, another photo of a firearm which

6   appears to be inside of a gun store as well or a pawn shop.

7   Q   And the bottom photo.

8   A   October 6, 2021, at 7:42 p.m.  It's another photo of a

9   firearm on top of a case in either a gun store or pawn shop,

10  consistent with the complaint.

11  Q   Sorry.  Page 15.

12  A   September 21, 2021, at 9:36.  It is another photo of St.

13  Louis holding a firearm in front of them inside of a gun shop

14  or pawn store.

15  Q   And again, these photos are hard to see of St. Louis, but

16  you indicated that you saw the live photo?

17  A   Yes, ma'am.  The live photo shows him moving around behind

18  it.

19  Q   And the bottom picture there.

20  A   September 29, 2021, at 6:07 p.m.  It's a photo of an

21  individual holding a magazine.

22  Q   And page 16, please.

23  A   September 8, 2021, at 1:57 a.m.  This is a photo of a

24  tattoo that says Jolie on it.

25  Q   And the bottom photo of 16.

Kenny – Direct

1  A   October 6, 2021, at 7:42 p.m.  Another photo of a firearm

2  inside of a gun shop or pawn store, consistent with the dates

3  stated in the complaint, and the ATF forms.

4  Q   Page 17, please.

5  A   Top left at October 1, 2021, 4:21 p.m.  It is a photo of an

6  individual holding a magazine inside of a plastic bag.

7  Q   And the top photo to the right.

8  A   Top right, September 28, 2021, at 9:01 p.m.  It's a photo

9  of a firearm inside of a box.

10 Q   And the bottom left-hand photo, please.

11 A   October 6, 2021, 7:42 p.m.  It's another photo of a firearm

12 inside of a gun shop.

13 Q   And the last photo there on the right, please.

14 A   The last photo is September 12, 2021, at 5:32 p.m.  It's a

15 photo of multiple firearms on top of what appears to be a case.

16      MS. KOONTZ:  All right.  Those are all the questions I

17 have for agent Kenny, your Honor.  I would turn him over for

18 cross-examination.

19      THE COURT:  All right.  Agent, you are familiar with

20 the contents of the complaint, is that correct?

21      THE WITNESS:  Yes, ma'am, I am.

22      THE COURT:  Are you prepared to adopt the allegations

23 made in the complaint as well as the proffer made by Ms. Koontz

24 as your direct testimony, in addition to what you just

25 testified to?

Kenny - Cross

1        THE WITNESS:  Yes, your Honor, I am.

2        THE COURT:  Any changes or additions that you wish to

3   make at this time?

4        THE WITNESS:  No, ma'am.

5        THE COURT:  All right.  Mr. Day, you may cross.

6        MR. DAY:  Thank you, your Honor.

7   CROSS EXAMINATION

8   BY MR. DAY:

9   Q    Agent Kenny, what was your personal involvement in this

10  case?

11  A    My personal involvement in this case has been minimal.  I

12  did help with the transport of St. Louis from the field office

13  to BSO, as well as transporting Tunis from Paul Rein down to

14  her initial appearance at FDC in Fort Lauderdale.  I've

15  conducted an interview in regards to this investigation, but it

16  wasn't an interview involving St. Louis or Tunis.

17  Q    Actually, you had no personal involvement in any of the

18  facts that have been proffered here by the government contained

19  in the complaint, is that right?

20  A    That's correct.

21  Q    All right.  Sir, with regard to the firearms that are

22  listed in paragraph 47 of the complaint, it indicates that

23  Mr. St. Louis purchased firearms in Miami on March the 13th of

24  2021?

25       THE COURT:  Debbie, I'm hearing you.

Kenny – Cross

```
 1              A VOICE:  I'm sorry.

 2              THE DEPUTY CLERK:  I just muted her, Judge.

 3              THE COURT:  OK.  Go ahead, Mr. Day.  Sorry.

 4              MR. DAY:  No, it is OK.  No problem.

 5   Q   Paragraph 47 indicates that Mr. St. Louis purchased

 6   firearms on March the 13th of 2021, September the 21st, 2021

 7   and October the 6th of 2021 in Miami.  Is that correct, sir?

 8   A   Yes, sir.

 9   Q   OK.  Are there video surveillance from those particular

10   purchases that the FBI has as evidence?

11   A   Not that I know of, sir.

12   Q   Does video surveillance of those particular purchases

13   exist?

14   A   Not that I know of, sir.

15   Q   Has the FBI gone to the places where it's alleged that

16   these firearms were purchased to determine whether there is a

17   videotaped recording of that purchase?

18   A   Not to my knowledge, sir, no.

19   Q   Are these federally-licensed firearms dealers that sold

20   these firearms on these three dates listed in paragraph 47?

21   A   They are, sir.

22   Q   OK.  They are required to have video recording inside their

23   businesses, isn't that correct?

24   A   I am not sure, sir.

25   Q   OK.  Well, do you know if they have video recordings inside
```

Kenny - Cross

1   their businesses that would record these purchases allegedly on

2   those dates?

3   A   Like I said, not to my knowledge, sir.  I don't know.

4   Q   So what evidence do you have that the firearms that were

5   purchased on those three particular dates were transferred to

6   Tunis or Dor or any other coconspirator?

7   A   So we have the evidence that those firearms were purchased

8   based on the receipts that were sent from St. Louis to Tunis,

9   as well as we have the analytic data showing the latitude and

10  longitude consistent with Tunis going to St. Louis' address to

11  obtain firearms.  We also have the audio message stating that

12  he had sent those firearms to a port near Haiti, near

13  Port-au-Prince.  Laboule 16.

14  Q   OK.  Anything other than that, sir?

15  A   Not to my knowledge.

16  Q   OK.  So with regard to the receipts, is it receipts for all

17  of the firearms that were purchased on those three dates that

18  were sent to Tunis?

19  A   So the receipts that I saw were the ones that were

20  purchased on October 6th.  It was the two Century Arms and the

21  Palmetto Arms.

22  Q   OK.  So that's three firearms, is that correct?

23  A   That's correct.

24  Q   So the FBI has evidence of receipts of three firearms that

25  were sent to Tunis, is that right?

Kenny - Cross

1   A   Correct.

2   Q   And what is the evidence that they were actually sent and

3   received?

4   A   Sent and received to who, sir?  Can you specify?

5   Q   Yes.  Sent by Mr. St. Louis -- I assume your testimony is

6   that he purchased these firearms on October the 6th, three of

7   them, and sent them to Tunis, is that right?

8   A   It appears he sent -- he went ahead and shipped them.  I'm

9   not sure of what firearms she came to pick up.  Like I said, I

10  have limited knowledge on the case.  But his text messages said

11  that he had sent two barrels to Laboule 16 that they charged

12  $400 for.

13  Q   We will get to that.

14  A   Based on --

15  Q   I'm sorry.

16  A   Go ahead.  I'm sorry.

17  Q   We will get to that in a minute.

18  A   OK.

19  Q   My question is, with regard to the transfer of the three

20  firearms that you've indicated that were purchased on October

21  the 6th, what is the evidence that they were actually shipped

22  to Tunis or anyone else?

23  A   I don't have any knowledge of that evidence, sir.

24  Q   OK.  Then the only evidence that I understand from your

25  testimony wherein Tunis received any of these firearms that

Kenny - Cross

1  were purchased on October the 6th is some longitude and

2  latitude evidence demonstrating that she went to his address,

3  is that right?

4  A   Yes, sir, to my knowledge.

5  Q   And what day was that, that that evidence shows she went to

6  the residence?

7  A   I have to review the complaint again.

8  Q   OK.  Is the date in the complaint?

9  A   It is October 19th.

10  Q   OK.  October 19th.  All right.

11  A   If you go to October 19th shipment, that part of the

12  complaint.

13  Q   OK.  Is there any evidence that in fact Tunis received

14  those three firearms that were purchased on October the 6th

15  from Mr. St. Louis on October the 19th?

16  A   Besides the lat and long, that's my knowledge of the

17  evidence there, sir.

18  Q   Right.  She could clearly have gone to the residence and

19  not received anything, right?

20  A   Yes, sir.

21  Q   So as far as you know and the FBI knows, there is no

22  evidence that on October the 19th Tunis received any firearms

23  that were purchased on October the 6th from Mr. St. Louis,

24  correct?

25  A   I would say as far as I know, but the other agents would

Kenny – Cross

1    know more.

2    Q   Well, you're the agent that is here today so you're the

3    only one that I can ask questions to, is that right?

4    A   Oh, I understand, sir.

5    Q   OK.  All right.  So the third thing that you are proffering

6    here and testifying here today that would demonstrate that

7    Mr. St. Louis transferred any of the firearms that he purchased

8    to Tunis or anybody else is audio messages that were sent to --

9    audio messages from Mr. St. Louis that he had sent items to a

10   port in Haiti, is that right?

11   A   The audio messages, yes.

12   Q   And where is that in the complaint?

13   A   That is the paragraph 40.  So on October 11th Tunis sent

14   St. Louis a photograph of a Western Union receipt from Haiti

15   showing that $2500 is wired to St. Louis' account.  On or about

16   October 11, 2021, approximately 55 minutes after the

17   transmission of the photographed message --

18           THE COURT:  Slow down, agent.  Slow down because the

19   interpreter has to keep up.

20           THE WITNESS:  Of course.

21   A   On or about October 11, 2021, approximately 55 minutes

22   after the transmission of the photographed message was

23   referenced in paragraph 39, St. Louis sent an audio message to

24   Tunis stating, "I sent two barrels and I have other firearms

25   inside of them.  They sent the barrels for $400.  The barrels

Kenny - Cross

1    went to Laboule 16."  And based on the agent's information,

2    Laboule 16 refers to a location south of Port-au-Prince.

3    Q    Thank you, agent.

4          How is it that the FBI was able to obtain this audio

5    message sent by St. Louis to Tunis?

6    A    From the federal search warrant conducted on Tunis' cell

7    phone.

8    Q    OK.  So in Tunis' cell phone there is an audio message from

9    St. Louis that you just referenced in paragraph 40?

10   A    Yes, sir.

11   Q    OK.  Is there any other audio messages from Mr. St. Louis

12   to Tunis or anybody else involved in this alleged conspiracy

13   that were found on her phone?

14   A    Yes, there were.

15   Q    OK.  And what's that?

16   A    So there were multiple messages between her, Coconspirator

17   1, Individual 2 showing possible three-way calls or conference

18   calls between them.  There's also text messages between Joslyn

19   Dor, another one of the straw buyers, and then there is also a

20   forwarded message that was sent to St. Louis, which was

21   admonishing him for not completing the firearms transactions

22   from there.

23   Q    OK.  Now, have any of those messages, text messages or

24   audio messages, been connected specifically with any of the

25   firearms that were purchased by Mr. St. Louis?

Kenny - Cross

1   A   What connection are you looking for?

2   Q   Any connection.  You have serial numbers.  You know the

3   firearms that were purchased on the three dates that we just

4   referenced previously in paragraph 47, correct?

5   A   Correct.

6   Q   So do you have any evidence that any of those specific

7   firearms, references to their caliber, serial numbers, or

8   anything else, were actually the firearms that are referenced

9   in any of the audio or text messages found on Tunis' phone?

10  A   I'm not sure of that, sir.

11  Q   OK.  So as we are here right now you have no evidence that

12  the firearms that Mr. St. Louis purchased on the dates

13  indicated in paragraph 47 are specifically connected to any of

14  the audio or text messages that are referenced in the

15  complaint, is that correct?

16  A   I would say -- he doesn't say anything in the audio that

17  says that the serial numbers on the firearms.  However, the

18  photos of him taken with the firearms as well as the receipt of

19  the firearms are all consistent with what is stated in the

20  complaint.

21  Q   Is there anything other than that?

22  A   Not to my knowledge.

23  Q   Right.  So again, my question is, there is no specific

24  evidence that the FBI has that the specific firearms purchased

25  in paragraph 47 or on any of the other dates were specifically

Kenny - Cross

1   referenced by Tunis or Dor or anybody else in this conspiracy

2   as being exported to Haiti?

3   A   Not to my knowledge.

4   Q   OK.  What evidence do you have that Mr. St. Louis was aware

5   that Tunis or Dor or anyone else shipped the firearms that he

6   purchased to Haiti?

7   A   I would say the paragraph stating that he had sent the

8   barrels to Laboule 16.

9   Q   OK.  Anything other than that?

10  A   Not to my knowledge, sir.

11  Q   Of course, in that voice message he doesn't reference any

12  of the specific firearms that he purchased, correct?

13  A   Not to specific make, model, caliber, no.

14  Q   And there is no other evidence that he was aware that any

15  firearms that he purchased were exported to Haiti other than

16  that voice message, is that correct?

17  A   Not that I'm aware of, no.

18  Q   Were there any Title III wiretaps that were employed in

19  this case?

20  A   Not to my knowledge.

21  Q   Are you aware of any connection between Mr. St. Louis and

22  the 400 Mawozo gang?

23  A   Not to my knowledge.

24  Q   Are you aware of any prior criminal history of Mr. St.

25  Louis?

Kenny - Cross

1   A   No.  I believe he had a clean criminal history.

2   Q   Never been arrested before, correct?

3   A   Not to my knowledge.

4   Q   Are you aware of any connection between Mr. St. Louis and

5   Coconspirator 1?

6   A   Not to my knowledge.

7   Q   Are you aware of any evidence between Mr. St. Louis and

8   Individual 2?

9   A   Not to my knowledge.

10  Q   Did you seize Mr. St. Louis' phone?

11  A   To my knowledge, his phone was seized.  When I had

12  transported him to BSO, the only property he had left on him

13  was just the case of his cell phone.

14  Q   OK.  So you don't know whether the FBI seized his cell

15  phone?

16  A   Not to my knowledge.  I'm not sure, sir.

17  Q   OK.  And where was he arrested?

18  A   I believe it was his residence.  Whenever I made contact

19  with them, he was at the Miami field contact.

20  Q   But he was arrested at his residence, which was 1240

21  Northwest 117th Street in Miami, is that right?

22  A   Like I said, I'm unsure of that, sir.

23  Q   Well, are you aware that's where he lives with his parents?

24  A   Correct.

25  Q   OK.  Are you aware of any indication whatsoever that the

Kenny - Cross

1    FBI had that Mr. St. Louis was going to flee the jurisdiction,

2    go back to Haiti or anywhere else?

3    A    Did we think he was going to flee?

4    Q    Did you have any evidence that he was in fact going to flee

5    the jurisdiction to Haiti or anywhere else?

6    A    No, sir.

7    Q    OK.  Did Mr. St. Louis give a post-Miranda statement?

8    A    I believe he was interviewed by the agents as well as the

9    supervisory agent.

10   Q    Was that a post-Miranda statement?

11   A    I wasn't there for any of the interviews, so I'm not sure

12   if he was Mirandized or if it was a consensual interview.

13   Q    And did he give a statement?

14   A    He did.

15   Q    What were the contents of that statement?

16   A    I'm not sure of the statements made to the agents.

17   Q    OK.  So you don't have any knowledge of the statement that

18   he would have given to the agents on the day of his arrest, is

19   that right?

20   A    No, sir.

21   Q    When Mr. St. Louis went to the federally-licensed firearms

22   dealers, in paragraph 47, and made the purchases that the FBI

23   has testified to in the complaint that he did, was he present

24   with another person?

25   A    I'm not sure, sir.

Kenny - Cross

1   Q   Do you know if Tunis or Dor or anybody else involved in

2   this conspiracy was present with him when he made those alleged

3   purchases on those dates?

4   A   Not to my knowledge.

5   Q   Any photographs in anybody's phone showing Mr. St. Louis

6   together with these firearms that were purchased, either with

7   Tunis or Dor or anybody else involved in the alleged

8   conspiracy?

9   A   We have the photos of him holding the firearms in front of

10  his face that are live photos, but besides that none that I

11  know of that are with Tunis or Dor.

12  Q   OK.  And those photographs, as I understand it, are at the

13  pawn shop, is that right?

14  A   From my understanding, yes.

15  Q   OK.  So other than that, no photographs of him with

16  firearms together with Tunis, Dor, or anybody else associated

17  with the conspiracy, is that right?

18  A   Not to my knowledge, sir.

19  Q   And have you reviewed the paperwork and were there, in

20  fact, ATF Forms 4473s that were executed on each of these three

21  dates?

22  A   I've seen them pulled up in the room; however, I did not

23  review them, no, sir.

24  Q   Paragraph 22 of the complaint, on page 10, indicates that

25  on October the 6th Tunis forwarded to St. Louis an audio

Kenny - Redirect

1   message via What's App in which Coconspirator 1 was admonishing

2   St. Louis for his failure to follow Coconspirator 1's

3   instructions to purchase firearms and praising Dor for quickly

4   following similar orders.  Upon hearing the message, St. Louis

5   responded, "I'm not going to pick up the stuff with that tone,

6   but don't worry, I'll fix it."

7           Are you familiar with that particular statement in

8   that paragraph, agent?

9   A   I am, sir.

10  Q   And where does that What's App message come from?

11  A   That What's App message is still -- all of the messages and

12  content referenced here have all been dumped from Tunis' cell

13  phone.

14  Q   So that was from the U.S. cell phone that the search

15  warrant was obtained with regard to?

16  A   Correct.

17  Q   OK.  Not the Haitian cell phone that she consented to, is

18  that right?

19  A   Correct.

20          MR. DAY:  I don't have any further questions, your

21  Honor.

22          THE COURT:  Any redirect?

23          MS. KOONTZ:  Just a few questions.

24  REDIRECT EXAMINATION

25  BY MS. KOONTZ:

Kenny - Redirect

1    Q   We know that on October the 6th, from the cell phone text

2    messages, that Tunis directed St. Louis to purchase two AK-47s

3    and one AR-15 firearm, is that correct?

4    A   That's correct.

5    Q   And he was told to go to a specific pawn shop in Miami and

6    purchase those from an individual by the name of Patrick.  Is

7    that correct?

8    A   That is correct.

9    Q   And a few hours after that -- well, approximately five

10   hours after that above text message, St. Louis sent Tunis those

11   pictures that you and I went over of what appeared to be him in

12   the pawn shop, is that right?

13   A   That's correct.

14   Q   And then we know from ATF records that he did in fact fill

15   out that 1470 or whatever ATF form it is there to fill out for

16   the purchase of firearms, is that correct?

17   A   That's correct.

18   Q   OK.  And then we know on October the 10th, after the

19   purchase of those firearms, that he sent, that St. Louis sent

20   Tunis a photograph of a single receipt from that pawn shop in

21   the amount of $2,855, correct?

22   A   Correct.

23   Q   And then again on October the 11th, the very next day,

24   Tunis sent St. Louis a photograph of a Western Union receipt

25   from Haiti showing that that $2,500 was wired to St. Louis'

Kenny – Redirect

1    account, correct?

2    A    Correct.

3    Q    OK.  And then we know on October the 11th, about 55 minutes

4    after the transmission of the photograph messages, St. Louis

5    sent that audio message, and that audio message told Tunis:  I

6    sent two barrels and I have other firearms inside of it.  They

7    sent the barrels for $400, and that those barrels went to

8    Laboule 16, which we know is a place south of Port-au-Prince,

9    is that correct?

10   A    That's correct, ma'am.

11   Q    And then again, I know you referenced this, but there was

12   also data in Tunis' phone, longitude and latitude data, that

13   shows that there are times that Louis, or Tunis would go to St.

14   Louis' address or coordinates close to his address, correct?

15   A    That's correct.

16   Q    And on one particular occasion, it was October 18th, which

17   was a day before a shipment which occurred on October the 19th,

18   correct?

19   A    Correct.

20   Q    And we know October the 19th from those photos because

21   those are the photos that were taken with the barrels and the

22   wrapped firearms, is that correct?

23   A    That is correct, ma'am.

24            MS. KOONTZ:  That is all I have, your Honor.

25            MR. DAY:  Your Honor, can I ask a couple of followup

Kenny - Recross

1    questions, because I think that is some new information?

2              THE COURT:  If it relates to something new on

3    redirect, yes.

4              MR. DAY:  Thank you, Judge.

5    RECROSS EXAMINATION

6    BY MR. DAY:

7    Q    Agent Kenny, do you have any evidence that any of the

8    firearms that were purchased by Mr. St. Louis are actually

9    those that are in the barrels that are photographed?

10   A    I just have the photos of the firearms and the time stamps.

11   So I'm not sure what firearms are actually behind or in the

12   barrels, no.

13   Q    So you can't connect any of the purchases that Mr. St.

14   Louis made with regard to serial numbers, with regard to any of

15   the items that were in those photographed barrels, is that

16   correct?

17   A    Not to my knowledge.

18   Q    And have any of the firearms that Mr. St. Louis purchased

19   been retrieved and corroborated to be sent by Mr. St. Louis

20   been retrieved in Haiti?

21   A    Not to my knowledge.

22             MR. DAY:  I don't have any further questions, your

23   Honor.

24             THE COURT:  All right.  Any further evidence,

25   Ms. Koontz?

Kenny - Recross

1            MS. KOONTZ:  No, your Honor.

2            THE COURT:  I can't recall, was this agent, has he

3    personally met Mr. St. Louis?

4            THE WITNESS:  Yes, your Honor, I have.

5            THE COURT:  All right.  And have you compared the

6    person that you arrested to the photographs that you have

7    testified about?

8            THE WITNESS:  Yes, ma'am, I have.

9            THE COURT:  And are you able to say whether or not the

10   person who was arrested was the same person depicted in those

11   photographs?

12           THE WITNESS:  Yes, your Honor.

13           THE COURT:  All right.  Mr. Day, any evidence,

14   testimony, or proffer on behalf of Mr. St. Louis?

15           MR. DAY:  Yes, your Honor.  Thank you.  A proffer.

16           As is indicated in the Pretrial Services report and

17   also the agent's testimony, Mr. St. Louis has been residing

18   here in the Southern District of Florida at that address

19   referenced where he was found and arrested, 1240 Northwest

20   117th Street in Miami, Florida, that's his parents' address,

21   Cadet St. Louis and Siltane St. Louis.  I believe they have

22   been listening in by phone.

23           As the court knows, Mr. St. Louis has no previous

24   criminal history whatsoever.  Mr. and Mrs. St. Louis, Mr. St.

25   Louis' parents, have $10,000, your Honor, that they are willing

Kenny - Recross

1    to pay into the registry of the court in support of a $100,000

2    10 percent bond.  In addition to that, Mr. St. Louis is

3    welcome, and is actually hoping, that he will be able to be

4    released and live with his parents at that address.

5         We would ask the court to set a $250,000 personal

6    surety bond and a $100,000 10 percent bond paid by the parents

7    and cosigned by Mr. and Mrs. St. Louis.

8         In addition to that, your Honor, we would agree to any

9    other condition that the court thinks is necessary to address

10   any issues regarding danger to the community or risk of flight,

11   including home confinement, electronic monitoring, GPS location

12   monitoring, and any type of a 24 hour/7 curfew whatsoever.

13        That is our proffer and also our request, our

14   argument.

15        THE COURT:  Ms. Koontz, any argument?

16        MS. KOONTZ:  Yes, your Honor.  As to danger to the

17   community, this defendant is supplying firearms to one of the

18   most brutal gangs in the Caribbean that is known for

19   kidnapping, torture, and rape.  They use violence to obtain

20   money.  This group has claimed responsibility for 17

21   missionaries, and he is connected (inaudible).  The

22   Coconspirator 1 had communication with him and admonished him

23   for some of his actions.

24        Your Honor, if he is released on bond, he will be able

25   to continue to facilitate the transfer of firearms to Haiti.

Kenny - Recross

1    Your Honor, he is a danger.  He is a danger to not only

2    individuals here in the United States but, more importantly, to

3    Haitians and the Americans that are in Haiti, and specifically

4    the 17 missionaries that are being held by this gang.

5         Your Honor, as to risk of flight, I mean, he is very,

6    very connected to Haiti.  He is a Haitian citizen.  He has

7    substantial ties to Haiti.  He was sending guns to Haiti.  All

8    his children reside in Haiti.  He admitted to traveling to

9    Haiti in 2020.  He is facing substantial federal prison time.

10   He is looking at a possible 20 years on ECRA, ten years for

11   smuggling, fire years on conspiracy to violate ECRA.

12        Your Honor, there is a burden in this case and, quite

13   frankly, the defense has not done anything to overcome that

14   burden and that presumption of detention.  This is a very

15   strong case.  Based on the strength of the government's case,

16   there is no conditions or combination of conditions that would

17   reasonably assure the appearance of the defendant or the safety

18   of the community.  For these reasons, your Honor, we ask that

19   he be held in pretrial detention.

20        THE COURT:  All right.  The defendant does have ties

21   to South Florida, but the court notes that there are no ties

22   whatsoever to the District of Columbia where this case is

23   pending.  The defendant, as the government just mentioned, has

24   very strong ties to Haiti and very little incentive to appear

25   for trial in the District of Columbia.  So I don't believe that

Kenny - Recross

1    there is any question of risk of flight.  Although there is no

2    evidence that the specific firearms that he purchased, there is

3    no direct evidence landed in Haiti, but there is a wealth of

4    circumstantial evidence from which a jury could infer that

5    these guns went to, as Ms. Koontz stated, an exceptionally

6    violent gang in Haiti which is continuing to hold American

7    citizens hostage, if they are still alive.

8           So the court finds that there is a danger to the

9    community, a presumption, which has not been rebutted.

10   Pretrial detention will be ordered on both grounds.

11          I also find that there is probable cause to believe

12   that the individual who is present before the court is the same

13   individual who committed the crimes alleged in the complaint,

14   and removal will be ordered.

15          MS. KOONTZ:  Thank you, your Honor.

16          MR. DAY:  Thank you, Judge.  Have a good day.

17          THE COURT:  You too.

18          (Adjourned)

19

20

21

22

23

24

25

Kenny – Recross

C E R T I F I C A T E

I hereby certify that the foregoing is an accurate

transcription to the best of my ability of the digital audio

recording in the above-entitled matter.


November 18, 2021        s/ Joanne Mancari
                         Joanne Mancari, RPR, CRR, CSR
                         Court Reporter
                         jemancari@gmail.com